ORIGINAL

Approved: _____
ANDREW D. BEATY/DANIEL C. RICHENTHAL
Assistant United States Attorneys

Before:  THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

15 MAG    4269

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :      **SEALED COMPLAINT**
                                        :
    - v. -                              :      Violations of
                                        :      18 U.S.C. §§ 1349,
CHERRISE WATSON-JACKSON,                :      1028A, and 2
    a/k/a "Reesie,"                     :
MAURICE CROMWELL,                       :      COUNTIES OF OFFENSE:
    a/k/a "Reece,"                      :      NEW YORK AND BRONX
ISAAC ALLEN,                            :
DERRICK WILLIAMS,                       :
    a/k/a "Blood,"                      :
COREY BROCK,                            :
    a/k/a "Cee,"                        :
GERARD STOKES,                          :
VERNECKA PETERSEN-FOWLER,               :
KEVIN WILLIAMS,                         :
YESENIA DEPENA,                         :
BEVERLY LORD,                           :
JARON ANNUNZIATA, and                   :
BEVERLY FRANKLIN,                       :
                                        :
                    Defendants.         :
                                        :
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JENNIFER M. RANUCCI, being duly sworn, deposes and says
that she is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Mail Fraud and Wire Fraud)

1.    From at least in or about January 2012 up to and
including at least in or about December 2013, in the Southern District
of New York and elsewhere, CHERRISE WATSON-JACKSON, a/k/a "Reesie,"
MAURICE CROMWELL, a/k/a "Reece," ISAAC ALLEN, DERRICK WILLIAMS,
a/k/a "Blood," COREY BROCK, a/k/a "Cee," GERARD STOKES, VERNECKA
PETERSEN-FOWLER, KEVIN WILLIAMS, YESENIA DEPENA, BEVERLY LORD, JARON
ANNUNZIATA, and BEVERLY FRANKLIN, the defendants, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, to commit mail
fraud and wire fraud.

2.    It was a part and an object of the conspiracy that
CHERRISE WATSON-JACKSON, a/k/a "Reesie," MAURICE CROMWELL, a/k/a
"Reece," ISAAC ALLEN, DERRICK WILLIAMS, a/k/a "Blood," COREY BROCK,
a/k/a "Cee," GERARD STOKES, VERNECKA PETERSEN-FOWLER, KEVIN
WILLIAMS, YESENIA DEPENA, BEVERLY LORD, JARON ANNUNZIATA, and
BEVERLY FRANKLIN, the defendants, and others known and unknown,
having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false and
fraudulent pretenses, representations and promises, for the purpose
of executing such scheme and artifice and attempting so to do, would
and did place in a post office and authorized depository for mail
matter, matters and things to be sent and delivered by the Postal
Service, and would and did deposit and cause to be deposited matters
and things to be sent and delivered by private and commercial
interstate carriers, and would and did take and receive therefrom,
such matters and things, and would and did cause to be delivered by
mail and such carriers according to the directions thereon, and at
the places at which they were directed to be delivered by the person
to whom they were addressed, such matters and things, in violation
of Title 18, United States Code, Section 1341.

3.    It was further a part and an object of the conspiracy
that CHERRISE WATSON-JACKSON, a/k/a "Reesie," MAURICE CROMWELL,
a/k/a "Reece," ISAAC ALLEN, DERRICK WILLIAMS, a/k/a "Blood," COREY
BROCK, a/k/a "Cee," GERARD STOKES, VERNECKA PETERSEN-FOWLER, KEVIN
WILLIAMS, YESENIA DEPENA, BEVERLY LORD, JARON ANNUNZIATA, and
BEVERLY FRANKLIN, the defendants, and others known and unknown,
having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false and
fraudulent pretenses, representations and promises, would and did
transmit and cause to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce,

writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Aggravated Identity Theft)

4.    From at least in or about January 2012 up to and including at least in or about December 2013, in the Southern District of New York and elsewhere, CHERRISE WATSON-JACKSON, a/k/a "Reesie," MAURICE CROMWELL, a/k/a "Reece," DERRICK WILLIAMS, a/k/a "Blood," COREY BROCK, a/k/a "Cee," GERARD STOKES, KEVIN WILLIAMS, and YESENIA DEPENA, the defendants, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Section 1028A(c), to wit, the defendants used and assisted others in using, among other things, the names and personal identifying information, including addresses and electronic benefit transfer card numbers, of other persons during and in relation to the offense charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.    I am a Special Agent with the FBI and have been with the FBI for approximately 13 years.  Through my training and experience, I have become familiar with various public assistance programs that are administered by New York City.

6.    I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, recordings, and conversations that I have had with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

SUMMARY OF THE SCHEMES

7.    Since in or about 2013, the New York City Department of Investigation ("DOI"), joined by the FBI and the New York State Office of the Welfare Inspector General ("NYS IG"), has been investigating two related schemes, as described further below, to commit extensive public assistance fraud.  The investigation has revealed that each of these schemes originated with and was run by CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant, who works as an Associate Job Opportunity Specialist II with the New York City Human Resources Administration ("HRA"), and has worked at HRA since in or about 1993.  In that capacity, she supervises a group of supervisors who in turn supervise teams of employees who review and determine eligibility for public assistance clients.

8.    Based on my training and experience and my conversations with others, I have learned that HRA is an agency of the City of New York (the "City") in charge of the majority of the City's public assistance programs.  Among other things, HRA provides temporary help to individuals and families with social service and economic needs to assist them in reaching self-sufficiency.  Its services include, among other things, administering the federally-funded Supplemental Nutrition Assistance Program ("SNAP") (more commonly known as "food stamps") and providing rental assistance to low-income families and individuals.

9.    As described further below, the first of the two charged schemes (the "EBT Fraud") involved CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant, fraudulently loading electronic benefit transfer ("EBT") cards with funds from SNAP, which funds were then spent by co-conspirators throughout the New York City area.   The second charged scheme (the "Rental Fraud") involved WATSON-JACKSON fraudulently causing rental assistance checks to be mailed to purported landlords of low-income tenants.  The "landlords" were not in fact landlords, but co-conspirators who were not otherwise entitled to the funds.  In total, the two schemes resulted in a loss of more than approximately $1.5 million in public funds.

## BACKGROUND

### *The EBT Fraud*

10.   Based on my training and experience, my review of DOI documents, and my conversations with other law enforcement agents, I have learned the following:

a.   An EBT card is a plastic card, encoded with machine-readable information, much like a credit or debit card. Public assistance funds may be loaded electronically to an EBT card, thereby avoiding the need to mail or otherwise provide a check or other form of funds to an individual in need.

b.   SNAP is a federally-funded public assistance program administered in the City by HRA, in which monetary benefits, to be used for eligible food items, are loaded onto EBT cards on a monthly basis for those who qualify for SNAP.  SNAP utilizes federal funds disbursed within New York State by the New York State Office of Temporary and Disability Assistance ("OTDA").  Individuals in the City apply for SNAP benefits at local HRA Job Centers, that is, offices, in their borough of residence.  If an individual meets income eligibility guidelines, the individual receives an EBT card, or, if he or she already has a card in connection with another public assistance program, he or she is authorized to have SNAP funds loaded onto the card.

c.   SNAP funds are issued onto an EBT card monthly, with the benefit amount determined based upon the individual's income and family size.  The individual spends SNAP funds by swiping the EBT card at participating merchants.

d.   To use an EBT card, the authorized user must key in an assigned Personal Identification Number ("PIN"). Specifically, to make a purchase, the authorized user must either swipe the EBT card in a manner similar to a credit card and key in the PIN number, or key in the EBT card number and then key in the PIN.

e.   JPMorgan Chase, which administered the funding for SNAP in the City during the relevant time period, maintained a customer service hotline ("the JPMorgan Hotline") which SNAP recipients could use to report lost or stolen cards, make balance inquiries, or change PINs.

f.    JPMorgan Chase allocated money from funding sources to HRA bank accounts in the City, including those used to fund SNAP, by means of an interstate wire.

g.    If a client loses his or her EBT card, the client can request a new card at the local HRA Job Center.  The new card is either mailed to the client or picked up at an over-the-counter site.

h.    Information about HRA clients and EBT benefits is maintained in a variety of New York City and New York State databases.  One source of information about SNAP benefit deposits onto clients' EBT cards is maintained by OTDA in the Specialized Fraud and Abuse Reporting System ("SFARS"), a document similar to a bank statement displaying each deposit onto a recipient's account and each time the recipient spends the funds.  SFARS displays SNAP deposits into a recipient's account, including the date, time, and amount of the deposit.  Additionally, SFARS displays each time a recipient spends SNAP benefits, including the date, time, location, and purchase amount of each transaction.  Information about actions taken on every HRA client's account, including SNAP benefits, is also maintained by New York State in the Welfare Management System ("WMS").  WMS retains any action taken on a client's account, and also retains the WMS worker identification number of the HRA employee who took that action.   The information can be obtained from WMS Audit Logs, a report which displays most actions taken on every HRA client's cases and the WMS worker identification numbers ("IDs") of HRA employees who took the actions on the case in question.

11.    Based on my participation in this investigation, I have learned that DOI and the NYS IG identified numerous fraudulent "single issuances" of SNAP benefits onto numerous EBT cards.  A "single issuance" is a one-time supplemental load of funds, which is generally supposed to occur only when a beneficiary has a documented, urgent need.  Specifically, investigation has revealed at least hundreds of such transactions, involving more than $1,000,000, between at least in or about 2012 and in or about 2013.  Almost all of these single issuances were over $1,000, and the majority involved HRA cases that were closed, that is, cases in which an individual received public assistance benefits for a period of time that terminated prior to the beginning of the single issuance.  While a mechanism exists for individuals to request emergency single issuances, even on closed cases, these issuances were determined to be fraudulent because they were unusually large and appeared to fit a pattern, and because no supporting documentation was filed with HRA for them, as is required.  Specifically, in the ordinary course,

recipients of single issuances are required to file an application and an HRA employee is required to fill out an assessment form, documenting the urgent need for funds.  No such documentation was filed in any of the single issuances identified herein as fraudulent.[1]

12.  All of the fraudulent EBT single issuances identified to date in the investigation originated from HRA Job Center 54, an HRA office in Queens, New York, where, during the relevant time period, CHERISSE WATSON-JACKSON, a/k/a "Reesie," the defendant, worked as a supervisor.

*The Rental Fraud*

13.  Based on my training and experience, my review of DOI documents, and my conversations with other law enforcement agents, I have learned the following:

a.  HRA can provide emergency rental assistance to assist individuals in danger of being evicted or having their utilities shut off.  This form of assistance, colloquially referred to as a "One Shot Deal," assists renters by paying arrears directly to landlords.  To apply for a "One Shot Deal," an individual must submit an application, a letter from his landlord, and a copy of his lease.  Checks, which are typically mailed, are issued in the name of the landlord, with an indication of the name of the tenant, for whose benefit the "One Shot Deal" has been issued.

b.  Funds for HRA's rental assistance come from federal, state, and City agencies.

14.  Based on my participation in this investigation, I have learned that DOI identified numerous fraudulent "One Shot Deal" rent checks issued to individuals who were not, in fact, landlords, and in which no supporting documentation was filed with HRA, as is required.  Specifically, investigation has revealed at least hundreds of such checks, involving more than $400,000, between at least in or about 2012 and in or about 2013. All of the checks identified to date as part of the Rental Fraud were for less than $1,000 (presumably because, under HRA regulations, checks greater than $1,000 require additional approval, and thus the Rental Fraud would have been more easily stopped or uncovered).  All of the tenant names listed on the fraudulent rental checks were the names of real people, as were all of the landlord names.  The

---

[1]   HRA records of single issuances prior to 2012 have not yet been analyzed in the investigation to date.

recipients of the checks, that is, the purported landlords, however, were not in fact landlords.  Rather, based on my review of records and my conversations with other law enforcement agents, I have learned that none of the defendants identified herein as having received and cashed checks as a landlord owns, or at the pertinent times owned, any real property in New York City.[2]

15.  Like all of the fraudulent single issuances discussed above, all of the fraudulent rental transactions identified to date in the investigation originated from HRA Job Center 54, the HRA office where, during the relevant time period, CHERISSE WATSON-JACKSON, a/k/a "Reesie," the defendant, worked as a supervisor.

## THE INVESTIGATION

16.  As described in further detail below, the investigation has revealed that numerous individuals participated in the EBT Fraud, the Rental Fraud, or both.

*Summary of the Defendants' Check Cashing and Receipt of EBT Benefits*

17.  Based on my training and experience, I have learned that there are a number of stores in the City that provide check-cashing services.  Banks also provide such services to individuals who maintain an account at the bank.  Based on my review of records, including photographs of individuals cashing checks, from check cashing stores, I have learned that MAURICE CROMWELL, a/k/a "Reece," KEVIN WILLIAMS, JARON ANNUNZIATA, BEVERLY FRANKLIN, VERNECKA PETERSEN-FOWLER, and BEVERLY LORD, the defendants, all cashed rental checks, each of which purportedly was a part of a legitimate "One Shot Deal," and all of which originated from HRA Job Center 54, including, with respect to multiple defendants, checks in names other than their own.  In addition, ISAAC ALLEN, DERRICK WILLIAMS, a/k/a "Blood," COREY BROCK, a/k/a "Cee," GERARD STOKES, and JARON ANNUNZIATA, the defendants, personally received fraudulent single issuances, all of which originated from HRA Job Center 54.

### MAURICE CROMWELL and ISAAC ALLEN

18.  The investigation has revealed that MAURICE CROMWELL, a/k/a "Reece," the defendant, cashed approximately 83 rental checks in names other than his own, each of which was part

---

[2]     HRA records of "One Shot Deal" rent checks prior to 2012 have not yet been analyzed in the investigation to date.

of a "One Shot Deal," and all of which originated from HRA Job Center 54.   These checks were worth approximately $72,561.   In addition to the checks cashed by CROMWELL himself, more than 100 other such checks were mailed to CROMWELL's home address, and then cashed by others. These additional checks were worth at least $75,000.   Specifically, based on my review of records, including photographs of CROMWELL cashing checks, I have learned the following:

        a.   At least approximately 83 rental checks, each of which purportedly was part of a legitimate "One Shot Deal," and all of which originated from HRA Job Center 54, were cashed by CROMWELL at a particular check cashing store, located on Pennsylvania Avenue in Brooklyn, New York ("Check Cashing Store-1"), between in or about September 2012 and in or about April 2013.

        b.   These checks were all in names other than CROMWELL's name.

        c.   All of these checks were processed by the same employee of Check Cashing Store-1, YESENIA DEPENA, the defendant.

        d.   In approximately the same time period, more than 100 additional rental checks, each of which purportedly was part of a legitimate "One Shot Deal," and all of which originated from HRA Job Center 54, were sent to CROMWELL's home address, and then cashed by others.

        19.   Based on my review of records, I have further learned that between in or about July 2012 and December 2013, the sister of MAURICE CROMWELL, a/k/a "Reece," the defendant, received multiple single issuances, totaling more than $12,313, on her EBT card.   As described above, these funds, and all other single issuances discussed herein, both originated from HRA Job Center 54 and were issued without any documentation justifying the single issuances ("fraudulent single issuances").

        20.   Based on my review of records, I have learned that between in or about June 2012 and in or about October 2013, ISAAC ALLEN, the defendant, received approximately $9,444 in fraudulent single issuances on his EBT card.

        21.   During the investigation, various cooperating witnesses have been interviewed, including CW-1, CW-2, and CW-3, who has each agreed to cooperate with law enforcement in the hope of avoiding federal charges.   All of these cooperating witnesses have

proven reliable and their information has been corroborated, including by records and other witnesses.

22. Based on my speaking with another law enforcement officer who participated in interviews of CW-1, and my review of documentation of the interviews, I have learned the following:

a. In or about 2012, CW-1 met MAURICE CROMWELL, a/k/a "Reece," the defendant, whom CW-1 knew as "Reece" and identified by photograph, through ISAAC ALLEN, the defendant. ALLEN informed CW-1 that CROMWELL could help CW-1 with CW-1's money problems by providing CW-1 with checks. ALLEN and CROMWELL both informed CW-1 that their source for the checks was a woman who worked at "welfare," whom they referred to both as "Reesie" and as "Homegirl."

b. At CROMWELL's direction, CW-1 provided CROMWELL with CW-1's first and last name. Several weeks later, CROMWELL contacted CW-1 and informed CW-1 that it was time to cash checks. CW-1 went with CROMWELL to a check cashing store in Queens, New York where CROMWELL handed CW-1 approximately six rental checks. CROMWELL waited outside while CW-1 cashed the checks. After CW-1 cashed four of those checks, CW-1 gave the cash to CROMWELL. At CROMWELL's direction, CW-1 kept the remaining two checks, which CW-1 deposited in CW-1's own bank account.

c. In or about 2012, ISAAC ALLEN, the defendant, whom CW-1 identified by photograph, informed CW-1 about an opportunity to receive SNAP benefits using an EBT card for a closed case. CW-1 provided ALLEN with an EBT card number, and thereafter, CW-1 received several deposits of money on that card.

d. Each time CW-1 received money on CW-1's card, CW-1 paid ALLEN and CROMWELL a cut of the money put on the card. CROMWELL informed CW-1 that CROMWELL had to give "Homegirl" the money, because she had put the money on the card.

e. CW-1 informed at least two other individuals about the EBT Fraud, and provided their EBT card information to ALLEN. Thereafter, those two individuals received SNAP funds on their cards, and paid a cut of the money to ALLEN through CW-1.

*KEVIN WILLIAMS*

23. The investigation has revealed that KEVIN WILLIAMS, the defendant, cashed approximately 96 rental checks, each of which

-10-

was part of a "One Shot Deal," and all of which originated from HRA Job Center 54, worth approximately $83,741. Of these checks, 57 were in KEVIN WILLIAMS's name, and 39 were in the names of others. Specifically, based on my review of records, including photographs of KEVIN WILLIAMS cashing checks, I have learned the following:

        a.    At least approximately 96 rental checks, each of which purportedly was part of a legitimate "One Shot Deal," and all of which originated from HRA Job Center 54, were cashed by KEVIN WILLIAMS between in or about January 2013 and in or about October 2013. These checks were worth approximately $83,741.

        b.    Of these checks, 57 were in KEVIN WILLIAMS's name, and 39 were in names of multiple other individuals.

        c.    Of the 39 checks in the names of others, all were processed by the same employee of Check Cashing Store-1, YESENIA DEPENA, the defendant.

    24.    Based on my speaking with another law enforcement officer who participated in interviews of CW-2, and my review of documentation of the interviews, I have learned the following:

        a.    CW-2 was recruited by KEVIN WILLIAMS, the defendant, to receive and cash fraudulent rental checks. KEVIN WILLIAMS informed CW-2 that a friend of KEVIN WILLIAMS, whom CW-2 knew as "Maurice," or, for short, "Reece," was the source of the checks.

        b.    CW-2 received approximately four checks from KEVIN WILLIAMS, which CW-2 cashed. At KEVIN WILLIAMS's direction, CW-2 gave all of the money from the checks to KEVIN WILLIAMS and to "Reece," and was given $700 in cash back.

        c.    KEVIN WILLIAMS informed CW-2 that he had a connection at a check cashing store on Pennsylvania Avenue.

    25.    As noted above, Check Cashing Store-1 is located on Pennsylvania Avenue.

    26.    Based on my review of records and my conversations with another law enforcement officer, I have further learned that subsequent to CW-2 cashing the four checks discussed above, an additional approximately 71 rental checks, in various names, were mailed to CW-2's home address, and later cashed by others. I have further learned CW-2 has informed law enforcement that CW-2 was not

aware that these additional checks had been mailed to CW-2's address, and that KEVIN WILLIAMS, the defendant, had access to CW-2's mailbox at this time.

### BEVERLY FRANKLIN

27.   The investigation has revealed that BEVERLY FRANKLIN, the defendant, cashed approximately 15 rental checks, each of which was part of a "One Shot Deal," and all of which originated from HRA Job Center 54, worth approximately $12,922.   Based on my review of records, I learned that these checks were cashed between in or about August 2013 and in or about November 2013.   I have further learned that between in or about August 2013 and in or about December 2013, approximately 88 other checks, each of which was part of a "One Shot Deal," and all of which originated from HRA Job Center 54, worth approximately $92,242, were mailed to FRANKLIN's Stepfather's Business ("FRANKLIN's Stepfather's Business").   None of these checks was FRANKLIN's stepfather's name.

28.   Based on my conversations with another law enforcement officer, I have learned that, on or about July 9, 2015, law enforcement officers interviewed BEVERLY FRANKLIN, the defendant, outside of her residence.   After law enforcement officers identified themselves, FRANKLIN stated, in substance and in part:

a.   FRANKLIN does not own any property and has never been a landlord or rented a room to anyone in the past.

b.   FRANKLIN received rental checks in her own name in the mail, which she cashed.   She gave the money to an individual not charged as a defendant herein, and received approximately $500 in return for each occasion she cashed checks.   FRANKLIN also received checks in the mail issued to other people's names.   FRANKLIN did not cash those checks, but rather gave them to the same individual.

c.   FRANKLIN knew the rental checks were issued by New York City.

### JARON ANNUNZIATA

29.   The investigation has revealed that JARON ANNUNZIATA, the defendant, cashed approximately 16 rental checks, each of which was part of a "One Shot Deal," and all of which originated from HRA Job Center 54, worth approximately $11,494.   The investigation has also revealed that ANNUNZIATA received fraudulent

single issuances on his EBT card, and ANNUNZIATA's family members received fraudulent single issuances and cashed fraudulent rental checks. Specifically, based on my review of records, including photographs of ANNUNZIATA cashing checks, I have learned the following:

a.   ANNUNZIATA cashed approximately 16 fraudulent rental checks in his own name between in or about August 2012 and in or about September 2012, and then again in or about September 2013. These checks were worth approximately $11,494.

b.   Some of checks were mailed to FRANKLIN's Stepfather's Business. Others were mailed to the home address of DERRICK WILLIAMS, a/k/a "Blood," the defendant.

c.   In addition, ANNUNZIATA's mother also received and cashed $4,750 worth of rent checks in her name, which she cashed in or about September 2013. All of these checks were mailed to FRANKLIN's Stepfather's Business. Based on my review of records, I have learned ANNUNZIATA's mother did not and does not own property in the City.

d.   Between at least in or about July 2012 and April 2013, ANNUNZIATA received approximately $4,901 in fraudulent single issuances on his EBT card.

e.   In addition, ANNUNZIATA's mother and sister each received $6,798 and $3,092, respectively, on their EBT cards, which originated from HRA Job Center 54, between in or about June 2012 and in or about March 2013, and between in or about June 2012 and in or about September 2012, respectively. No application or other documentation was ever submitted for these single issuances.

*VERNECKA PETERSEN-FOWLER*

30.   As noted above, the investigation has revealed that VERNECKA PETERSEN-FOWLER, the defendant, cashed and/or deposited approximately 43 rental checks, each of which was part of a "One Shot Deal," and all of which originated from HRA Job Center 54, worth approximately $31,026. Based on my review of records and my conversations with another law enforcement officer, I have learned that these checks were cashed and/or deposited between in or about late December 2011 and in or about September 2013.

31.   Based on my conversations with another law enforcement officer, I have learned that, on or about May 5, 2015,

-13-

law enforcement officers interviewed VERNECKA PETERSEN-FOWLER, the defendant, in her residence.   After law enforcement officers identified themselves, PETERSEN-FOWLER stated, in substance and in part:

        a.   Neither PETERSEN-FOWLER nor her husband owns any property, and PETERSEN-FOWLER has never been a landlord.

        b.   PETERSEN-FOWLER received fraudulent rent checks from an individual not charged as a defendant herein ("CC-1"), which she cashed.   PETERSEN-FOWLER kept approximately $100 per check, and gave the rest to CC-1.   In addition, PETERSEN-FOWLER received rent checks by mail.

        c.   PETERSEN-FOWLER deposited some of the rent checks she received into a personal bank account, and transferred the deposited funds to a bank account of CHERISSE WATSON-JACKSON, a/k/a "Reesie," the defendant, a friend who had issued the checks. CC-1 or WATSON-JACKSON then gave a portion of the transferred funds to PETERSEN-FOWLER in cash.

        32.   I have spoken with another law enforcement officer regarding a review of bank records of VERNECKA PETERSEN-FOWLER and CHERISSE WATSON-JACKSON, a/k/a "Reesie," the defendants.   From my conversations, I have learned that, on multiple occasions, PETERSEN-FOWLER deposited fraudulent rent checks and thereafter withdrew cash from her account, and that, only a few days later, WATSON-JACKSON deposited sums of cash in similar amounts into her own bank account.   In addition, on at least one occasion, PETERSEN-FOWLER transferred funds directly to WATSON-JACKSON's account two days after PETERSEN-FOWLER deposited rent checks.

*BEVERLY LORD*

        33.   The investigation has revealed that BEVERLY LORD, the defendant, cashed approximately 38 rental checks, each of which was part of a "One Shot Deal," and all of which originated from HRA Job Center 54, worth approximately $27,539.   Based on my review of records and my conversations with another law enforcement officer, I have learned that these checks were cashed between in or about March 2012 and in or about August 2012.

        34.   Based on my conversations with another law enforcement officer, I have learned that, on or about October 3, 2014, law enforcement agents interviewed BEVERLY LORD, the defendant,

outside of her residence.   After law enforcement officers identified themselves, LORD stated, in substance and in part:

        a.   LORD was recruited to participate in the Rental Fraud by a man who identified himself as "Reece" as she came out of HRA Job Center 54.  With "Reece," LORD cashed a number of rental checks on three different occasions.  LORD received $50 each time she cashed checks with "Reece."

<em>YESENIA DEPENA</em>

        35.  As noted above, KEVIN WILLIAMS, the defendant, informed CW-2 that he had a connection at a check cashing store on Pennsylvania Avenue, which is where Check Cashing Store-1 is located.

        36.  Based on my participation in the investigation, my review of records from Check Cashing Store-1, and my conversations with another law enforcement officer, I have learned the following with respect to YESENIA DEPENA, the defendant:

        a.   DEPENA was employed at Check Cashing Store-1 as a check casher, and, in that capacity, processed the cashing of at least 221 rental checks between in or about September 2012 and in or about June 2013 that have been identified as part of the Rental Fraud, including more than 100 checks cashed by MAURICE CROMWELL, a/k/a "Reece," and KEVIN WILLIAMS, the defendants, in multiple names, none of which matched the name of the defendant cashing the checks. Several times, DEPENA cashed checks for CROMWELL and/or KEVIN WILLIAMS in multiple different names in the same series of transactions within minutes on the same day.

        b.   These 221 checks were worth approximately $187,462.

        37.  From speaking with the Vice President for Compliance of Check Cashing Store-1, I have learned that Check Cashing Store-1 requires customers cashing checks to open an account to do so; that opening an account requires a customer to show identification; that the computer system of Check Cashing Store-1 maintains a photograph of the account-holder; and that the computer system also maintains a photograph of person cashing a check, each time he or she cashes the check.  I have further learned that Check Cashing Store-1 has a policy of instructing its employees either to review of identification of the person cashing a check, each time he or she cashes the check.

38.  From my review of records from Check Cashing Store-1, including photographs, I have learned that on each of those occasions when YESENIA DEPENA, the defendant, processed the cashing of checks by MAURICE CROMWELL, a/k/a "Reece," and KEVIN WILLIAMS, the defendants, where the name on the check did not match the name of the defendant cashing the check, she used an account at Check Cashing Store-1 in the name of the person on the check (the "Account Holder"), not the name of the defendant cashing the check.  I have further learned that the photograph of the Account Holder in the computer system of Check Cashing Store-1 for each such check did not match the appearance of the defendant in front of her who cashed the check.

39.  Based on my review of phone records and my conversations with another law enforcement officer, I have learned that a phone subscribed to in the name of CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant, called Check Cashing Store-1 approximately eight times between in or about March 2013 and in or about June 2013.

*DERRICK WILLIAMS*

40.  Based on my participation in the investigation and my review of HRA records, I have learned the following with respect to DERRICK WILLIAMS, a/k/a "Blood," the defendant:

a.  Between at least in or about July 2012 and December 2013, DERRICK WILLIAMS received approximately $12,553 in fraudulent single issuances on his EBT card.

b.  Approximately 82 fraudulent rental checks were mailed to the home address of DERRICK WILLIAMS between in or about January 2012 and in or about June 2013.  These checks were worth approximately $61,768.

c.  At least eight of the fraudulent rental checks mailed to the home address of DERRICK WILLIAMS were cashed in the Bronx, New York.

41.  Based on my review of call records from the JPMorgan Hotline (which, as discussed above, SNAP clients can use to report lost or stolen cards, make balance inquiries, or change their PINs), I have learned that a phone subscribed to by DERRICK WILLIAMS, a/k/a "Blood," the defendant, called hundreds of times to check the balance of EBT cards that were in other people's names.  For example, DERRICK WILLIAMS called at least 125 times in November and December of 2013 alone.  The majority of the calls were made either right before or

right after a purchase was made at BJ's Wholesale Club using an EBT card that had received fraudulent single issuances. For example, on or about December 23, 2013, a particular EBT beneficiary ("Beneficiary-1") received approximately $1,267 in a fraudulent single issuance on Beneficiary-1's EBT card. DERRICK WILLIAMS called the JPMorgan Hotline four times over the next four days to check the balance on Beneficiary-1's EBT card. In the four days after the fraudulent single issuance was added to the EBT card, Beneficiary-1's EBT card was used to make approximately $1,190 worth of purchases at BJ's Wholesale Club and elsewhere.

<em>COREY BROCK</em>

42. Based on my review of HRA records, I have learned that between in or about October 2012 and in or about November 2013, COREY BROCK, a/k/a "Cee," the defendant, received approximately $8,562 in fraudulent single issuances on his EBT card.

43. Based on my review of documents and my conversations with other law enforcement officers, I have learned that, on or about May 19, 2015, the Criminal Court of the State of New York, Queens County, issued a search warrant for the residence of COREY BROCK, a/k/a "Cee," the defendant, in Queens, New York. On or about the following day, May 20, 2015, the search warrant was executed by members of the New York City Police Department. This search yielded, among other things, 45 EBT cards (the "Brock EBT Cards") and 13 cellphones (the "Brock Cellphones").[3]

44. Subsequent to the search described above, I and others reviewed the 45 Brock EBT Cards. Of the 45 cards, only three are in the name of COREY BROCK, a/k/a "Cee," the defendant. Based on my review of documents, I have learned that 18 of the 45 cards received fraudulent single issuances, which originated from HRA Job Center 54, between in or about September 2012 and in or about December 2013.

45. Based on my review of HRA and records of BJ's Wholesale Club, I know that at least one EBT card that was not in the name of COREY BROCK, a/k/a "Cee," the defendant, was used to make purchases at a BJ's Wholesale Club location, using a BJ's account in BROCK's name.

---

[3]     The search also yielded, among other things, firearm cartridges and cocaine, MDMA, and marijuana. I understand that BROCK has pending charges against him in Queens County arising from the search and related investigation.

46.   On or about July 20, 2015, the Honorable Kevin Nathaniel Fox issued a search warrant for the Brock Cellphones. Based on my review of the communications contained therein, I have learned that at least one of the Brock Cellphones exchanged communications between in or about 2014 and in and about 2015 with a cellphone subscribed to by CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant.

47.   Based on my review of call records from the JPMorgan Hotline, I have learned that one of the Brock Cellphones called the JPMorgan Hotline hundreds of times.   For example, between in or about November 2013 and in or about January 2014, this cellphone called approximately 35 times to check the balance of EBT cards that were in names other than that of COREY BROCK, a/k/a "Cee," the defendant. For example, on or about November 26, 2013, a particular EBT beneficiary ("Beneficiary-2") received approximately $1,117 in a fraudulent single issuance on Beneficiary-2's EBT card.   One of the Brock Cellphones called the JPMorgan Hotline three times on November 27 and 29, 2013 to check the balance on Beneficiary-2's EBT card. On November 29 and 30, 2013, Beneficiary-2's EBT card was used to make approximately nine transactions, totaling approximately $927, at a particular store.

### GERARD STOKES

48.   Based my review of HRA records, I have learned that, between at least in or about October 2012 and in or about April 2013, GERARD STOKES, the defendant, received approximately $4,844 in fraudulent single issuances on his EBT card.

49.   Based on my review of records, including surveillance footage, I have learned that GERARD STOKES, the defendant, repeatedly used his BJ's Wholesale Club account to make purchases using funds loaded onto EBT cards that were not in his name.   Specifically, I have learned the following:

a.   Between in or about July 2013 and in or about November 2013, STOKES made at least nearly 100 separate purchases at locations of BJ's Wholesale Club in New York City, including in Queens, New York, and Brooklyn, New York.

b.   These purchases totaled nearly $120,000.

c.   Each purchase was paid for using an EBT card, or more than one EBT card, that was not in STOKES's name.

-18-

        d.    The vast majority of these purchases were for large amounts of Red Bull energy drink.

        50.    Based on my review of phone records, I have learned that a cellphone subscribed to by GERARD STOKES, the defendant, called the JPMorgan Hotline approximately 65 times between in or about April 2013 and in or about November 2013, the same period in which he was making certain of purchases discussed above.  I have further learned that the same cellphone called cellphones used by COREY BROCK, a/k/a "Cee," and DERRICK WILLIAMS, the defendants, around the time when STOKES was at BJ's Wholesale Club, and that a number of these calls were made either right before or right after a purchase was made at BJ's using an EBT card in a name other than that of STOKES.  For example, on or about November 16, 2013, a particular EBT beneficiary ("Beneficiary-3") received approximately $2,400 in a fraudulent single issuance on Beneficiary-3's EBT card.  STOKES called the JPMorgan Hotline two times on November 17, 2013 to check the balance on Beneficiary-3's EBT card.  Also on November 17, 2013, Beneficiary-3's EBT card was used to make approximately $2,073 worth of purchases at BJ's Wholesale Club.

                        *CHERRISE WATSON-JACKSON*

        51.    As discussed above, all of the fraudulent checks and fraudulent single issuances uncovered in the investigation to date originated at HRA Job Center 54, where CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant, presently works as a supervisor, and did so at the relevant times.  Based on my review of documents and conversations with others, I have learned that, in her supervisory role, WATSON-JACKSON had the ability to send and cause others to send such fraudulent checks and single issuances.  I have further learned that the investigation has revealed that WATSON-JACKSON did so, in return for kickbacks from those she assisted to defraud the public assistance programs she was supposed to administer for those in need.

        52.    From my review of HRA records and timesheets, and my conversations with others, I have learned the following:

        a.    The WMS system may be accessed using a user identification log-in, commonly referred to as a user ID.

        b.    Five WMS user IDs, which were assigned to five different HRA employees, including CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant, were used to issue the fraudulent single issuances identified to date.    Four WMS user IDs, including

WATSON-JACKSON's, were used to issue the fraudulent rent checks identified to date.

        c.   WMS user IDs are unique, in that they are assigned only to one employee, and HRA policy prohibits the sharing of IDs and passwords.   However, the employees to whom the user IDs discussed above were assigned were often not clocked in to work at Job Center 54 at the time when the single issuances or rent checks identified as fraudulent in the investigation to date were authorized.   WATSON-JACKSON, however, was clocked in at the time when every fraudulent single issuance and fraudulent rent check identified to date was authorized.

        d.   WATSON-JACKSON went on medical leave from her job at HRA from in or about late December 2013 up to in or about late August 2014.   During this time, the EBT Fraud and the Rental Fraud did not occur.

        53.   From my conversations with another law enforcement officer regarding the records of the four different cellphone numbers subscribed to in the name of CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant, I have learned the following:

        a.   Two different cellphone numbers subscribed to by WATSON-JACKSON called the JPMorgan Hotline more than 130 times between in or about January 2013 and in or about December 2013.   Based on my conversations with others, I have learned that it would be extremely unusual for WATSON-JACKSON, in connection with her legitimate work at HRA, to need to call the JPMorgan Hotline more than 130 times, much less to do so from a phone other than her office phone, a landline.

        b.   During the time period of the schemes described herein, at least one of WATSON-JACKSON's cellphones was in repeated contact with at least one of the Brock Cellphones and with telephone numbers associated with DERRICK WILLIAMS, a/k/a "Blood," and VERNECKA PETERSEN-FOWLER, the defendants.   Many of these contacts occurred on or about the same day as when EBT cards that received fraudulent single issuances were used to make purchases, and when other defendants were also in similar contact.   For example, on or about November 19, 2013, a number subscribed to in the name of GERARD STOKES, the defendant, called the JPMorgan Hotline.   On or about following day, November 20, 2013, both a number subscribed to in the name of DERRICK WILLIAMS and one of the Brock Cellphones called the JPMorgan Hotline.   The same day, the same Brock Cellphone made and/or received calls or texts with DERRICK WILLIAMS, STOKES, and a number

subscribed to in the name of WATSON-JACKSON. Later the same day, STOKES used approximately seven EBT cards that had received fraudulent single issuances to make purchases at BJ's Wholesale Club.

54. From my conversations with another law enforcement officer regarding the review of bank records, I have learned, as discussed above, that, on multiple occasions, after VERNECKA PETERSEN-FOWLER, the defendant, deposited fraudulently-obtained rental checks into her own account, she withdraw funds in cash, and, soon thereafter, cash was deposited into an account of CHERRISE WATSON-JACKSON, a/k/a "Reesie," the defendant. I have also learned, as discussed above, that, on at least one occasion, after PETERSEN-FOWLER deposited fraudulently-obtained rental checks into her bank account, PETERSEN-FOWLER transferred funds in similar amounts to an account in WATSON-JACKSON's name. I have further learned that WATSON-JACKSON holds a joint bank account with MAURICE CROMWELL, a/k/a "Reece," the defendant, and that several large cash deposits were made into the joint account between in or about February 2013 and in or about October 2013.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of CHERRISE WATSON-JACKSON, a/k/a "Reesie," MAURICE CROMWELL, a/k/a "Reece," ISAAC ALLEN, DERRICK WILLIAMS, a/k/a "Blood," COREY BROCK, a/k/a "Cee," GERARD STOKES, VERNECKA PETERSEN-FOWLER, KEVIN WILLIAMS, YESENIA DEPENA, BEVERLY LORD, JARON ANNUNZIATA, and BEVERLY FRANKLIN, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
JENNIFER M. RANUCCI
Special Agent
Federal Bureau of Investigation


Sworn to before me this
30th day of November 2015

_____
THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

-21-